IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHARNAE ADAMS, ET AL., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 12-5603 |
| | : | |
| US AIRWAYS GROUP, INC. AND | : | |
| US AIRWAYS, INC., | : | |
| | : | |
| Defendants. | : | |

Goldberg, J.                                                    October 18, 2013

## MEMORANDUM OPINION

Plaintiffs, passengers on a US Airways flight to Orlando, have alleged that they were removed from the flight based upon their race. Plaintiffs have brought claims against Defendants, US Airways Group, Inc. and US Airways, Inc. (collectively "US Airways"), for race discrimination under 42 U.S.C. § 1981 (Count I, "Discrimination In The Making and Enforcement of Contract") and negligence (Count II, "Negligent Screening, Hiring, Training, Supervising, Disciplining and/or Retaining" and Count III, "Negligent Breach of Duty of Common Carrier").

Presently before the Court is Defendants' Motion to Dismiss, which raises issues regarding preemption and pleading sufficiency. For the reasons set forth below, Defendants' motion will be granted in part and denied in part.

1

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Based upon the averments in Plaintiffs' first amended complaint, the pertinent facts, viewed in the light most favorable to Plaintiffs, are as follows:

On July 5, 2010, Plaintiffs boarded a US Airways flight from Philadelphia to Orlando for a family vacation to Disney World.  The traveling party consisted of four adults and seven children.  Plaintiffs believe that they were the only African Americans aboard the flight.  (First Am. Compl. ¶¶ 1–11, 17–19, 36.)[1]

Once Plaintiffs were seated, they fastened their seatbelts with the exception of Malaki Adams, who has Down syndrome and was a toddler at the time.  When his mother, Sharnae Adams, could not buckle the seatbelt, she pressed the overhead button to call for a flight attendant.  When no one arrived to assist her, Adams moved her son to a seat across the aisle.  (Id. ¶¶ 20–24.)

It is alleged that at this point, an off-duty US Airways flight attendant flying on a "buddy pass" or "employment pass" became involved.  In the altercation that followed, the off-duty attendant claimed to be a United States Air Marshal, and told Sharnae Adams that she was violating the law.  Before gathering with the other flight attendants, the off-duty attendant allegedly called Sharnae Adams a "black bitch" and gave her the middle finger.  Plaintiff Tyrone Mitchell was seated near the flight attendants and overheard them say that "the black people" were causing trouble on the plane.  Plaintiffs allege that this statement was also made to the aircraft's captain.  (Id. ¶¶ 25–32.)

---

[1] The adult plaintiffs are Sharnae Adams, Beverly Adams, Tameka Adams and Tyrone Mitchell. The minor plaintiffs are Malaki Adams, Trent Adams, Troy Adams, Serena Adams, Tammy Mitchell, Tamara Spellman and Jade Adams.  (Id. ¶¶ 1–11.)

The plane, which had apparently left the boarding gate, subsequently taxied back to the terminal where Plaintiffs were removed from the plane. At some point during this process, an unidentified US Airways employee allegedly referred to the African-American Plaintiffs collectively as "you people," and the captain warned Plaintiffs to "keep their mouths shut" or they would be removed from another flight. Back at the terminal, a manager for US Airways put Plaintiffs on a later flight to Orlando and as a result, Plaintiffs missed the first day of their vacation. (Id. ¶¶ 33–35, 37–38, 41–45.)

Plaintiffs commenced this action in the Philadelphia Court of Common Pleas on July 5, 2012, and Defendants removed the case to this Court on October 1, 2012. Plaintiffs subsequently filed their First Amended Complaint on November 8, 2012 and on November 26, 2012, Defendants filed the instant Motion to Dismiss. The matter is now fully briefed and ready for disposition.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for failure to state a claim upon which relief can be granted. When ruling on a Rule 12(b)(6) motion, the court must accept the facts pled in the complaint as true and construe them in the light most favorable to the plaintiff. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000). The court may dismiss a complaint or claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). However, a plaintiff must provide more than a formulaic recitation of a claim's elements that amounts to mere labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level." Id. "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

## III.   DISCUSSION

### A.   State Law Negligence Claims

Defendants first challenge Plaintiffs' state law negligence claims, alleged in Counts II and III.  Count Two, styled as "Negligent Screening, Hiring, Training, Supervising, Disciplining and Retaining" pertains to US Airways alleged negligent staff training regarding seat-belting and staff use of a "buddy pass." Count Three, styled as "Negligence Breach of Duty of Common Carrier," generally alleges that US Airways was negligent in removing Plaintiffs from the plane and in handling seatbelt issues.

Defendants argue that part of these claims are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) (the "Deregulation Act").[2]  Defendants also contend that Plaintiffs have failed to adequately state their claims.  (Defs.' Br. 4, 7.)  We address each argument in turn.

---

[2] Defendants assert that the Deregulation Act preempts Count II in its entirety and Count III to the extent it is premised on Plaintiffs removal from the plane.  However, Defendants do not argue that the Deregulation Act is implicated by Count III's seatbelt-related allegations, and thus do not raise their preemption argument with respect to those claims.  (Defs.' Br. 4-7, n.3.)

4

**1.  Deregulation Act Preemption**

The Airline Deregulation Act was enacted to promote "maximum reliance" on market forces by reducing airline regulation.  <u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 378 (1992).  To prevent states from frustrating this purpose, Congress included an express preemption provision, which provides that a state may not enact or enforce any "law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."[3]  49 U.S.C. § 41713(b)(1).  The United States Supreme Court has considered the scope of this provision on three separate occasions.

First, in <u>Morales v. Trans World Airlines, Inc.</u>, the Court determined that the Deregulation Act has a "broad pre-emptive purpose," superseding state laws that have "a connection with or reference to" the rates, routes, or services of an airline.  504 U.S. at 384.  Following this standard, the Court found that state guidelines concerning the way airlines advertise their fares are preempted.  <u>Id.</u> at 391.  While it did not directly address tort actions, the Court noted that some state laws may have "too tenuous, remote, or peripheral" a connection to the price, route or service of an airline to have a preemptive effect.  <u>Id.</u> at 390.

The Court again considered preemption under the Deregulation Act in the context of a frequent flyer contract dispute in <u>American Airlines, Inc. v. Wolens</u>, 513 U.S. 219, 228 (1995).  There, the Court held that the Deregulation Act preempted a state consumer fraud claim because it directly related to the "marketing mechanisms appropriate to the furnishing of air transportation services."  <u>Id.</u>  However, the Court reasoned that state actions to enforce contracts

---

[3] "Pennsylvania common law is considered an 'other provision having the force and effect of law' for purposes the Airline Deregulation Act."  <u>Thompson v. U.S. Airways</u>, 717 F. Supp. 2d 468 (E.D. Pa. 2010) (citing <u>United Airlines, Inc. v. Mesa Airlines, Inc.</u>, 219 F.3d 605, 607 (7th Cir. 2000)).

were not preempted because they were the result of voluntary private agreements, not state action. Id.

After Congress employed the language of the Deregulation Act to deregulate the trucking industry, the Supreme Court again interpreted 49 U.S.C. § 41713. See Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 370 (2008) (noting that when Congress purposefully uses language from an existing statute, it also imports the judicial interpretation of that language). Noting that the trucking statute copied the preemption language of the Deregulation Act, the Court looked to Morales for guidance and held:

> (1) that [s]tate enforcement actions having a connection with, or reference to carrier rates, routes, or services are pre-empted; (2) that such pre-emption may occur even if a state law's effect on rates, routes or services is only indirect; (3) that, in respect to pre-emption, it makes no difference whether a state law is consistent or inconsistent with federal regulation; and (4) that pre-emption occurs at least where state laws have a significant impact related to Congress' deregulatory and pre-emption-related objectives. . . . Finally, Morales said that federal law might not pre-empt state laws that affect fares in only a tenuous, remote, or peripheral . . . manner.

Id. at 370–71 (citations omitted) (internal quotation marks omitted) (emphasis omitted). Applying this standard to the preemption language of the trucking statute, the Court held that federal law preempted a Maine statute requiring tobacco retailers, when shipping tobacco, to employ a transport carrier that provides a special recipient-verification service. Id. at 377.

Despite these cases, the Supreme Court has offered no clear definition of what constitutes an airline "service." Circuit Courts have adopted conflicting views on the meaning of service. Id.

The United States Court of Appeals for the Fifth Circuit has developed an expansive view of airline services. See Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir. 1995) (en

banc).  Under this view, the Deregulation Act preempts state laws, including common law, which relate to the "bargained-for or anticipated provision of labor" from the airline to the customer. Id.  Because features beyond air transportation are included in a bargain with an airline, the definition encompasses "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself."  Id.

A majority of circuits have adopted this broad definition of service.  See Air Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 223 (2d Cir. 2008) (holding that Deregulation Act preempted state law that required amenities for passengers experiencing ground delays); Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1258–59, 1260-61 (11th Cir. 2003) (adopting broader reading of the term "services" but concluding that state whistleblower claim not preempted because it did not implicate a bargained-for feature of air carriers); Smith v. Comair, Inc., 134 F.3d 254, 259 (4th Cir. 1998) (citing Hodges to find that boarding procedures are an airline service); Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1433 (7th Cir. 1996) (adopting the Fifth Circuit's definition of service but finding slander and defamation claims not preempted).

Conversely, the United States Court of Appeals for the Ninth Circuit has adopted a more limited definition of airline services.  See Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1266 (9th Cir. 1998) (en banc).  Noting that the Deregulation Act was enacted as an economic deregulation statute, the Ninth Circuit determined that the act was intended to insulate airlines from state economic regulations, not from liability for their own tortious conduct.   Id. Accordingly, the court found that Congress meant service in the public utility sense, meaning the "provision of air transportation to and from various markets at various times."   Id.  In that context, "service does not refer to the pushing of beverage carts, keeping the aisles clear of

stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions." Id.[4]

      The United States Court of Appeals for the Third Circuit weighed in on this circuit split in Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186 (3d Cir. 1998).  There, a travel agency brought a defamation action against an airline for advising the travel agency's customers that their tickets were considered stolen.  Id. at 188.  The Third Circuit held that the defamation claims were not preempted by the Deregulation Act.   The court concluded that, when determining whether the Deregulation Act preempts a state law, the focus should be on "the competitive forces of the market," rather than on the distinction between "services" and "operations."   The court importantly noted that "[w]hen state law does not have a regulatory effect, it is 'too tenuous, remote or peripheral' to be preempted."   Id. at 194 (citing Morales, 504 U.S. at 390).  Applying these considerations to the defamation claims at issue, the court found that application of state law in the case before it did "not frustrate Congressional intent, nor [did] it impose a state utility-like regulation on the airlines."   Id. at 195.   As such, state claims were "'too tenuous, remote, or peripheral' to be subject to preemption, even though [the defendant's] statements refer[red] to ticketing, arguably a 'service.'"   Id.   In so holding, the Third Circuit stressed that "the Supreme Court, although it has not yet directly addressed the pre-emption clause as applied to state court claims, has strongly indicated that they would not be barred."   Id.

      In discussing the scope of the Deregulation Act's preemption provision, the Taj Mahal court focused much of its discussion on tort claims for physical injuries, despite the fact that

---

[4] The Ninth Circuit also subsequently held that the Deregulation Act does not preempt a passenger's state disability discrimination claim.  Newman v. Am. Airlines, Inc., 176 F.3d 1128, 1131 (9th Cir. 1999).  However, as discussed infra, the Third Circuit considered the Ninth Circuit's definition of service before Newman.  Thus, we cannot assume that the Third Circuit would similarly expand Charas' reasoning to claims related to alleged discriminatory denial of air travel.

defamation claims were at issue.  See id. at 194 ("It would make little sense to require insurance to pay for bodily injury claims if airlines were insulated from such suits by the preemption provision."); id. ("We consider it highly unlikely that claims caused by careening service carts and plummeting luggage were to be removed from state adjudication."); id. ("It is highly unlikely that Congress intended to deprive passengers of their common law rights to recover for death or personal injuries sustained in air crashes.").  The Third Circuit also did not expressly adopt the approach of any of the other circuit courts.  After acknowledging the differing views, the court simply noted that the Charas approach offered "a more promising solution."  Id.

Following Taj Mahal, the Third Circuit clarified the connection necessary to render a state law "related to" an airline's price, routes or services such that it is preempted by the Deregulation Act.  In Gary v. Air Grp., Inc., 397 F.3d 183 (3d Cir. 2005), the court stated that a state law will have the "requisite connection" to price, routes or services where "the law expressly references the air carrier's price, routes or services, or has a forbidden significant effect upon the same."  397 F.3d at 186 (quoting United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 335 (1st Cir. 2003) (internal quotation marks omitted)).

Because the Third Circuit did not expressly adopt Charas' definition of "service," district courts in this circuit have found preemption, citing the reasoning of the majority approach.  We discuss these cases below but decline to follow their reasoning.

In Panitich v. Cont'l Airlines, 2008 WL 906240, at *5 (D.N.J. Mar. 31, 2008), the court found that in Taj Mahal, the Third Circuit adopted Charas "only insofar as it limits the extension of the preemption provision to all state common law causes of action, and in particular to personal injury claims."  While the Panitich court was correct in noting that the Third Circuit did not "expressly" adopt the Ninth Circuit's more "limited view," the Third Circuit expressly stated

that "the approach espoused by the Court of Appeals for the Ninth Circuit in <u>Charas</u> offers a more promising solution."  We view this as a fairly clear directive regarding the law of this Circuit.  <u>Taj Mahal Travel</u>, 164 F.3d at 194.

The district court in <u>Panitich</u> distinguished the facts before it from those in <u>Taj Majal,</u> such that claims for intentional and negligent infliction of emotional distress stemming from an airline's refusal to accommodate a passenger's peanut allergy were preempted.  The court found that food and beverage services were "a 'service' within the meaning of the [Deregulation Act]'s preemption provision."  <u>Panitich</u>, 2008 WL 906240 at *6 n.4.  While directives on food service may constitute a "public utility-style regulation" that the Deregulation Act seeks to eliminate, the facts alleged here, which could be read as part defamation, part breach of contract and part discrimination are tenuously related to "the competitive forces of the market," which is what the Third Circuit looks to in its preemption analysis.  <u>Taj Mahal Travel</u>, 164 F.3d at 194.

<u>Shulick  v. United Airlines</u>, 2012 WL 315483, at *7 n.6 (E.D. Pa. Feb. 2, 2012) involved botched travel plans and missed flights—facts that are completely different than the ones before us.  Plaintiffs brought claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, which prohibits "misrepresenting the standard or quality of goods and services…and engaging in fraudulent or deceptive conduct which creates likelihood of confusion."  <u>Id.</u> at *5.  The court found the state law preempted as it would affect airlines' ability to advertise, cancel flights and provide service.  Conversely, the allegations here do not implicate any type of regulations affecting air travel.

The parties dispute the effect of <u>Taj Mahal</u>'s application to the instant case and whether Plaintiffs' claims are preempted by the Deregulation Act.  We initially note that Plaintiffs' claims are ordinary negligence claims, and do not expressly reference a subject preempted by the

Deregulation Act.  Thus, we will look at the facts underlying Plaintiffs' causes of action to determine whether enforcement of the state claim would have an impermissible effect on Defendants' price, routes or services.

The state law claims in question and facts supporting those claims primarily arise from Plaintiffs removal from the aircraft and the treatment Plaintiffs received from the flight attendant flying on the buddy pass.  (See Pls.' Br. 16.)  Even assuming that the off-duty flight attendant and other staff's actions somehow relate to airline services, we find that, under Taj Mahal, these claims are "too tenuous, remote, or peripheral" to be subject to preemption.  Defendants have not articulated, nor can we discern, any impermissible regulatory effect that these claims would have on an airline's services.  Enforcement of these state actions would not require airlines to offer services that the market does not currently provide, nor would it require airlines to modify their policies on removal or treatment of passengers in any substantial way (that is, because as discussed infra, the Federal Aviation Act already sets forth regulations with respect to such conduct).  Therefore, at this stage of the litigation, we decline to find that the Deregulation Act preempts Plaintiffs' claims.  The Deregulation Act's purpose of deregulation regarding prices, routes and services does not mean that US Airways should be granted immunity from all tort liability.

Our ruling that preemption does not apply also includes the treatment by the flight attendant flying on the buddy pass.  We cannot conclude, based solely on the pleadings, that Plaintiffs' negligence claim relates to the service of an airline.  No factual record has been developed on the duties of a flight attendant flying on an employee pass or on how the altercation originated.  The flight attendant allegedly called Sharnae Adams a "black bitch," gave her the middle finger and attempted to intimidate her by impersonating an air marshal.  Viewing

11

these allegations in the light most favorable to Plaintiffs, this behavior bears no clear relation to an airline service, though that could become apparent through the course of discovery. Therefore, Count II will survive with respect to the allegations pertaining to Plaintiffs' on-board treatment.

### 2. Sufficiency of Allegations

#### a. FAA Preemption – Standard of Care

Given our determination that Plaintiffs' negligence claims survive the Deregulation Act's preemption, we next address Defendants' contention that Plaintiffs have failed to state a claim. Before examining the adequacy of the allegations, we evaluate the threshold issue of whether the Federal Aviation Act, 49 U.S.C. §§ 40101 et. seq. ("FAA"), preempts the state-law standard of care for each claim.

#### i. Relevant Law

Congress enacted the FAA to increase air safety by creating a single, uniform system of regulations. Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 368 (3d Cir. 1999) (citing City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 639 (1973)). As such, the Third Circuit has held that the FAA preempts "the entire field of aviation safety." Id. at 365. Federal law therefore determines the appropriate standards of care for aviation safety, while state law controls the other negligence elements (breach, causation and damages), as well as the choice and availability of remedies. Id. at 372, 375; Elaasaad v. Independent Air, Inc., 613 F.3d 119, 125 (3d Cir. 2010).

The contours of the field of "aviation safety" extend beyond in-flight situations. See Elaassaad, 613 F.3d at 127, 130 (noting that, while the court's holding in Abdullah v. American Airlines, Inc. was limited to in-air safety, preemption would apply to claims related to other

operations, including the takeoff and landing of an aircraft).   Indeed, the Federal Aviation Administration promulgated Regulation 91.13 to define the general parameters of an airline's duty, and such regulation applies to both in-flight operations and ground operations.  14 C.F.R. § 91.13.

### ii.   Applicable Standard of Care for Plaintiffs' Negligence Claims

In Count II, Plaintiffs allege that Defendants were negligent in screening, hiring, training, disciplining and/or retaining the in-flight staff.   More specifically, Plaintiffs assert that Defendants were negligent in that they did not properly train the in-flight staff on how to properly aid in the seat-belting of developmentally delayed children and did not set out a policy regarding the in-flight function and role of staff flying on "buddy passes."   Plaintiffs also allege that Defendants created conditions, policies or customs, which facilitated Plaintiffs' "abuse" by the flight attendants and captain.   In addition, Plaintiffs state that the flight attendant on the "buddy pass" committed negligence, and that Defendants are vicariously liable for her conduct. (First Am. Compl. ¶¶ 57-70.)

In Count III, Plaintiffs assert that Defendants breached the duty of a common carrier by removing Plaintiffs from the airplane for no reason.   Further, Plaintiffs allege that Defendants were negligent in providing security, namely ensuring that there were functioning seatbelts on the aircraft.  (Id. ¶¶ 71-77.)

With respect to the allegations that Defendant negligently failed to provide and assist with seatbelts, we find that they implicate air safety.   The FAA contains safety-related regulations that pertain to the training, hiring and retention of flight attendants, and while there is not a specific regulation addressing the provision of functioning seatbelts, the FAA sets forth a general standard of care that "[n]o person may operate an aircraft . . . in a careless or reckless

manner so as to endanger the life or property of another."  14 C.F.R. § 91.13; see also Elassaad, 613 F.3d at 129 (noting the application of the FAA's broader standard "where there is no specific provision or regulation governing air safety").  Based on the allegations contained in the complaint, the plane's engine was running and it had taxied away from the gate when the conduct occurred, such that the plane was being operated "other than for the purpose of air navigation" under 91.13(b).  See 14 C.F.R. § 91.13(b); see also Elaassaad, 613 F.3d at 130 (noting that subsection (b) applies "to those acts which impart some physical movement to the aircraft, or involve the manipulation of the controls of the aircraft such as starting or running an aircraft engine").  Accordingly, we conclude that the FAA's general prohibition on careless or reckless operation of an aircraft preempts the state-law standard of care with regard to these allegations.[5]

Similarly, Plaintiffs' Count III allegations related to their removal from the airplane involve issues of air safety.  The FAA sets forth an airline's right "to refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." 49 U.S.C. § 44902 The discretion to refuse transport is broad and requires only a belief that a passenger may be inimical to safety.  Cerqueria v. American Airlines, Inc., 520 F.3d 1, 12 (1st Cir. 2008).  When removal from a flight is at issue, the pilot in command is the final authority.  Id. (citing 14 C.F.R. § 91.3(a).)  On review, courts have generally looked to whether the decision to refuse passage was arbitrary or capricious.  See, e.g., Williams vs. Trans World Airlines, 509 F.2d 942 (2d Cir.

---

[5] To the extent that Plaintiffs' allegations regarding the seatbelt may have arisen before the plane's engine was running, such that the plane was not operating under 14 C.F.R. § 91.13(b), the result is the same.  While the state law standard of care would apply, as discussed infra, Plaintiffs have failed to state how a malfunctioning seatbelt that they did not use caused their alleged injuries.

1975).  Because the FAA so clearly links refusal to transport with safety considerations, we find
it preempts state law and that § 44902 governs Plaintiffs' removal allegations.

On the other hand, the allegations of mistreatment by flight attendants contained in Count
II do not implicate aviation safety, and thus we conclude that a claim premised on such facts
does not fall within the scope of the FAA's broad preemption.  We disagree with Defendants that
the FAA's training, hiring and retaining regulations set forth the relevant standard of care.  Those
regulations are safety-related, and do not pertain to the general treatment of passengers.  We
conclude that the state-law standard of care applies to the abusive treatment claims of Count II.

Having determined the FAA provisions that apply to Plaintiffs' seatbelt and removal
allegations, and that state law negligence governs the altercation with flight attendants, we now
turn to whether Plaintiffs adequately state claims.

### b.  Whether Count II Adequately States a Claim

First, we turn to the allegation that Defendants were negligent in not properly training the
in-flight staff on how to assist in the seat belting of developmentally delayed children.  As
discussed supra, the FAA preempts state law and provides the standard of care in this area.
Plaintiffs have not alleged that Defendants failed to comply with the FAA's safety-related
regulations on training flight attendants.  Thus, Plaintiffs have not stated a breach of the FAA's
standard of care.

With respect to the allegations of abusive treatment, we look to Pennsylvania negligence
law.  Because Plaintiffs seek to hold Defendants directly liable due to negligent screening,
hiring, training, supervising, disciplining or retaining of the flight staff, and vicariously liable
through the theory of respondeat superior, we must consider the claim under both theories.  (See
First Am. Compl. ¶¶ 58-60, 61, 66, 68-69, 70.)

### i. Direct Liability

Negligent screening, hiring, training, supervision, or retaining holds an employer directly liable for its own negligent failure to protect a plaintiff from an employee that it knows, or has reason to know, is likely to cause injury.  RESTATEMENT (SECOND) OF TORTS § 317; see also Dempsey v. Walso Bureau, Inc., 246 A.2d 418, 419–20 (Pa. 1968) (noting that Pennsylvania adopted the Restatement approach).  These claims differ from claims for vicarious liability because they allow plaintiffs to recover for harms that occur when employees act outside the scope of their employment.  Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 487-88 (3d Cir. 2013) (applying Pennsylvania law).  To state a direct claim, the plaintiff must allege "(1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee."  Id. Under this standard, the employee's prior behavior must put the employer on notice that it must control the employee.  See Heller v. Patwil Homes, Inc., 713 A.2d 105, 108 (Pa. Super. Ct. 1998) (noting that an employee's prior behavior must indicate a propensity to cause the harm in question and that the employer must know or have reason to know about such prior behavior).

Plaintiffs have failed to allege any prior conduct by any members of the flight staff that would trigger US Airways' duty to control them.  Plaintiffs make only the conclusory statement that Defendants knew or should have known that the in-flight staff was "negligent, dangerous and likely to disrupt passengers."  (Id. ¶ 58.)  Such allegation is insufficient to plausibly show that US Airways knew or had reason to know of a need to control its employees.

Therefore, Plaintiffs have failed to state a claim of direct liability for negligent screening, hiring, training, supervision, or retaining against US Airways.

### ii.  Vicarious Liability

In Pennsylvania, an employer is vicariously liable for the harm caused to third parties by its employees' tortious acts, "provided that such acts were committed during the course of and within the scope of the employment."  Costa v. Roxborough Mem'l Hosp., 708 A.2d 490, 493 (Pa. Super. Ct. 1998).  The conduct of an employee is within the scope of employment if: "(1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer."  Dillow v. Myers, 916 A.2d 698, 700 n.4 (Pa. Super. Ct. 2007).  Typically, the determination of whether an employee acted within the scope of his or her employment is a question for the jury.  Costa, 708 A.2d 490, 493 (Pa. Super. Ct. 1998) (citing Straiton v. Rosinsky, 133 A.2d 257, 259 (Pa. Super. Ct. 1957)).  Nevertheless, a court need not reach the course and scope of employment issue where a plaintiff has not first demonstrated an underlying tort, or other harm, committed by an employee.

Here, Plaintiffs have not asserted a separate claim against any of the flight staff, nor have they articulated a specific cause of action against these individuals.  Viewing the allegations in a light most favorable to Plaintiffs, we read the complaint as potentially asserting one of the following claims: (1) intentional infliction of emotional distress (IIED); or (2) negligent infliction of emotional distress (NIED).  However, because Plaintiffs have not alleged any bodily harm as a result of the flight staff's actions, they cannot make out either claim, such that Defendants could be held vicariously liable.  See Fulton v. United States, 198 Fed App'x 210, 215 (3d Cir. 2006) (citing Reeves v. Middletown Ath. Ass'n, 866 A.2d 1115, 1122-23 (Pa. Super. Ct. 2004); Doe v. Phila. Cmty. Health Alternatives AIDS Task Force, 745 A.2d 25, 27-29

(Pa. Super. Ct. 2000) ("In Pennsylvania, both intentional and negligent infliction of emotional distress require a manifestation of physical impairment resulting from the distress.").  Therefore, Count II is dismissed in its entirety.

> **Comment [RMS1]:** Possibly replace with something like "plaintiff asserts claims under theories of direct and vicariously liability.  However, vicarious liability requires an underlying tort committed by the employee, which is not alleged here"

### c.  Whether Count III Adequately States a Claim

We next address whether Plaintiffs have plausibly stated a claim with respect to Count III.  Because Count III is premised on both Plaintiffs' removal and the provision of a faulty seatbelt, we again must evaluate the underlying allegations individually.

The decision to remove Plaintiffs from the flight is analyzed under § 44902's broad grant of discretion to refuse transport for safety reasons, and is subject to review only as to whether it was arbitrary and capricious.  Viewing the allegations in the light most favorable to Plaintiffs, we find that they have pled facts sufficient to state a plausible claim that their removal was motivated by racial discrimination and not safety concerns.  See infra pp. 21-22.  Therefore, we will not dismiss the removal allegations contained in Count III at this time.

Regarding Plaintiffs' faulty seatbelt allegations, the relevant standard of care is that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."  To prevail on this claim, Plaintiffs must demonstrate all of the elements of their negligence claim, including breach, causation and damages.  Elassaad, 613 F.3d at 125.

Plaintiffs make no such demonstration.  They assert merely that Malaki Adams' seatbelt was defective.  However, even if the defective seatbelt was capable of "endanger[ing] the life or property" of Malaki Adams, it did not do so in this case.  Not only was the seatbelt never required to prevent an injury, but when Sharnae Adams noticed the issue she removed her son from that seat and any danger it posed.  (First Am. Compl. ¶¶ 22, 24.)  Because no physical

injury or property damage occurred, Plaintiffs cannot allege causation or damages.  Accordingly, Count III's seatbelt allegations will be dismissed.

**B.  Race Discrimination**

In addition to their negligence claims, in Count I Plaintiffs assert intentional race discrimination pursuant to 42 U.S.C. § 1981.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . ."  42 U.S.C. § 1981(a).  To "make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  Id. § 1981(b).

In order to establish a right to relief under § 1981, a plaintiff must show: (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981.  Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 569 (3d Cir. 2002).  Claims under § 1981 follow the structure of a claim for employment discrimination under Title VII of the Civil Rights Act of 1964.  See Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267 (3d Cir. 2010) (citing Brown v. J. Kaz, Inc., 581 F.3d 175, 181 (3d Cir. 2009)) (applying an employment discrimination analysis to a § 1981 discriminatory lending claim); Dasrath v. Cont'l Airlines, Inc., 467 F. Supp. 2d 431, 444-45 (D.N.J. 2006) (applying the same analysis to a claim for discriminatory removal from an airplane).  Plaintiffs may therefore either present direct evidence of discrimination using the test announced in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), or indirect evidence through the burden-shifting framework of  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Anderson, 621 F.3d at 267–68.

19

To demonstrate direct evidence of discrimination, a plaintiff must present evidence so "revealing of [discriminatory] animus" that it is unnecessary to rely on indirect evidence.  Id. at 269 (quoting Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 (3d Cir.1997)) (alteration in original).  Direct evidence demonstrates that the decision makers placed "substantial negative reliance on an illegitimate criterion in reaching their decision." Id. (quoting Walden, 126 F.3d at 513) (internal quotation mark omitted).  It must be connected to the challenged decision and reveal that a discriminatory attitude was more likely than not a motivating factor in the defendant's decision.  Id.  There, to constitute direct evidence, discriminatory statements must be "made at a time proximate to the challenged decision and by a person closely linked to that decision." Id. This means that discriminatory animus by a non-decision maker cannot simply be applied to the final decision maker.  Id. at 270. The Third Circuit has repeatedly explained that these requirements pose a "high hurdle" for plaintiffs.  E.g., id. (citing Walden, 126 F.3d at 513); Anderson v. Consol. Rail Corp., 297 F.3d 242, 248 (3d Cir. 2002).

To demonstrate indirect evidence of discrimination, a plaintiff bears the initial burden of establishing a prima facie case of discrimination.  Id. at 271.  Unlike the high hurdle for direct evidence of discrimination, the requirements of a prima facie case for indirect evidence of discrimination are "not onerous." Id. (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  The purpose at this stage is to eliminate the most common nondiscriminatory reasons for the defendant's behavior.  Id.  By doing so, the test creates an inference that a defendant's actions were discriminatory.  Id.

If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to articular a legitimate, nondiscriminatory reason for the unfavorable treatment. Id.  Once the defendant comes forward with such a reason, the plaintiff must then show by a

preponderance of the evidence that the articulated reason was merely a pretext for intentional discrimination. <u>Id.</u>

Defendants argue that Plaintiffs have not alleged adequate evidence to prove discrimination directly or indirectly. Specifically, Defendants contend that Plaintiffs have asserted insufficient facts to show that their race was the reason they were removed from the aircraft. (Defs.' Br. 13–18.)

The decision to remove a passenger from an aircraft is made by the captain. <u>See</u> 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."); <u>see also</u> <u>Cerqueira v. Am. Airlines, Inc.</u>, 520 F.3d 1, 13 n.13 (1st Cir. 2008) (noting that, as a matter of law, the pilot in command makes the decision to remove a passenger). Under the FAA, the captain may refuse to transport a passenger that he decides "is, or might be, inimical to safety." 49 U.S.C. § 44902(b) (2006). Such a refusal cannot give rise to a claim for damages unless the decision was "arbitrary and capricious." <u>Dasrath v. Cont'l Airlines, Inc.</u>, 467 F. Supp. 2d 431, 445 (D.N.J. 2006) (citing <u>Williams v. Trans World Airlines</u>, 509 F.2d 942, 947 (2d Cir. 1975)). This grants airlines "broad, but not absolute," discretion to remove passengers for safety reasons. <u>Id.</u> However, an airline's discretion under § 49902 is not "a license to discriminate." <u>Bayaa v. United Airlines, Inc.</u>, 249 F. Supp. 2d 1198, 1205 (C.D. Cal. 2002).

While Plaintiffs have not sufficiently alleged direct evidence that the pilot racially discriminated in his decision to remove them from the plane, we find that they have adequately stated a <u>prima facie</u> case through evidence of indirect discrimination. Plaintiffs allege that they had a racially charged argument with a US Airways flight attendant who called Sharnae Adams a "black bitch," gave her the middle finger and impersonated an air marshal, while another US

21

Airways employee referred to Plaintiffs collectively as "you people."  Though the captain was not present for the initial altercation, the same people who were previously engaged in this argument communicated with the captain shortly before his decision, and allegedly told him that the "black people" were causing trouble.  The captain then removed all eleven African-American passengers from the plane, not just Sharnae Adams.  The captain also warned Plaintiffs to "keep their mouths shut" or they would be removed from another flight.  (First Am. Compl. ¶¶ 18, 28–38.)

Viewing these allegations in the light most favorable to Plaintiffs, and bearing in mind that evidence of the captain's intent is solely in the possession of Defendants, we find that the captain's alleged decision to remove all African-American passengers from the flight and his hostile parting comments, all on the heels of an overtly racial argument, give rise to an inference that the captain intentionally discriminated against Plaintiffs when he removed them from the plane. Therefore, Defendants' motion to dismiss the § 1981 claim will be denied.[6]

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss will be granted in part and denied in part.

An appropriate Order follows.

---

[6] We note that Plaintiffs also contend that they have adequately stated a § 1981 claim on the basis of the flight crew's behavior prior to the removal.  Because it is unclear whether the discriminatory conduct must rise to the level of an adverse action to state a claim, we find that it would be premature to dismiss the claim on this basis at this time.